UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
DAVID ORTIZ DORTA,                          :
                                            :
                  Plaintiff,                :
                                            :         **OPINION AND ORDER**
        -against-                           :
                                            :         18-CV-00396 (JLC)
ANDREW M. SAUL,[1]                          :
Commissioner, Social Security              :
Administration,                             :
                                            :
                  Defendant.                :
-------------------------------------------------------------X

**JAMES L. COTT, United States Magistrate Judge.**

Plaintiff David Ortiz Dorta ("Ortiz") seeks judicial review of the decision by

defendant Andrew M. Saul, the Commissioner of the Social Security

Administration, denying his claim for Disability Insurance Benefits and

Supplemental Security Income under the Social Security Act.  Ortiz has moved for

judgment on the pleadings, requesting that the Court reverse the Commissioner's

decision and remand his case.  The Commissioner has cross-moved for judgment on

the pleadings, contending that the decision should be affirmed.  For the reasons set

forth below, Ortiz's motion is granted, the Commissioner's cross-motion is denied,

---

[1] Andrew M. Saul is now the Commissioner of the Social Security Administration.
Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Saul is hereby
substituted for former Acting Commissioner Nancy A.  Berryhill as the defendant in
this action.  *See, e.g., Pelaez v. Berryhill*, 12-CV-7796 (WHP) (JLC), 2017 WL
6389162, at *2 n.1 (S.D.N.Y. Dec. 14, 2017), *adopted by*, 2018 WL 318478 (S.D.N.Y.
Jan. 3, 2018).

1

and the case is remanded for further proceedings pursuant to sentence four of 42 U.S.C. § 405(g).

# I. BACKGROUND

## A. Procedural History

Ortiz filed applications for Disability Insurance Benefits ("DIB") on February 2, 2015 and for Supplemental Security Income ("SSI") on September 26, 2016, both citing an alleged disability onset date of June 3, 2014. Administrative Record ("AR") dated May 17, 2018 at 15.[2] The Social Security Administration denied Ortiz's DIB application on April 22, 2015. *Id.* at 126–37.[3] Ortiz requested a hearing in front of an Administrative Law Judge, which took place on March 2, 2017. *Id.* at 95–113. On August 1, 2017, the ALJ issued a decision denying Ortiz's application. *Id.* at 15–33. Ortiz requested a review of the ALJ decision on October 2, 2017, and his application was again denied on November 15, 2017. *Id.* at 1, 7.

Ortiz then commenced the present action, seeking judicial review of the ALJ's decision. On January 31, 2019, Ortiz moved for judgment on the pleadings and submitted a memorandum in support of his motion ("Pl. Mem."). The Commissioner cross-moved for judgment on the pleadings and submitted a memorandum in support of her cross-motion on March 22, 2019 ("Def. Mem."). Ortiz replied on April 19, 2019 ("Pl. Reply").

---

[2] The page numbers refer to the sequential numbering of the Administrative Record provided on the bottom right corner of the page, not the numbers produced by this District's Electronic Case Filing System.

[3] Ortiz's SSI application, which was filed after the denial of his DIB claim, was consolidated with the DIB claim. AR at 15.

### B. Administrative Record

#### 1. Ortiz's Background

At the time of the hearing in March 2017, Ortiz was 46 years old. He lives in the Bronx, is separated from his wife, and has custody of his two children. *Id.* at 99–100. His children were ages eight and nine as of the hearing date; his younger son is autistic. *Id.* Ortiz had a step-son who committed suicide in August 2014, and he and his children received counseling due to this incident. *Id.* at 108, 393. He takes his children to school and picks them up every day, prepares meals for them, and drives them to their counseling sessions. *Id.* at 108, 110–11. Ortiz cooks, cleans, does laundry, and goes shopping. *Id.* at 109–12. He occasionally receives assistance from friends with cooking and cleaning. *Id.* at 111–12.

Ortiz attended college and worked for 23 years as a paraprofessional for the New York City Board of Education until he left the position in 2014 due to his alleged disability onset. *Id.* at 103. Ortiz has not worked full-time since June 2014, but he did work part-time for a period of about four months in 2016 as a security guard. *Id.* at 101.

#### 2. Relevant Medical Evidence in the Record

##### a. Treating Physicians

###### i. Dr. Orsuville Cabatu

Ortiz saw Dr. Orsuville Cabatu, a physical medication and rehabilitation specialist, for physical therapy of both his wrists 10 times between July 2014 and January 2015. *Id.* at 435–54. Prior to seeing Dr. Cabatu, Ortiz had right and left carpal tunnel release surgeries on August 29, 2013 and June 3, 2014, respectively.

*Id.* at 375, 377.[4]  After his left carpal tunnel release surgery, Dr. Cabatu began treating Ortiz.  *Id.* at 435.  On July 22, 2014, Ortiz reported bilateral numbness, a burning sensation in the left wrist, difficulty with grip, wrist weakness, and tender and swollen wrists.  *Id.* at 438.  Dr. Cabatu observed that Ortiz had wrist tenderness and swelling throughout this period.  *Id.* at 435, 437, 439, 441, 443, 445, 447, 449, 451, 453.  Dr. Cabatu also noted that Ortiz's complaints were consistent with his findings through the visits.  *Id* at 436, 438, 440, 442, 444, 446, 448, 450, 452, 454.  On July 22, 2014, Dr. Cabatu assessed Ortiz for a worker's compensation claim and opined that Ortiz had a 100 percent temporary impairment.  *Id.* at 438.  He concluded that Ortiz's temporary impairment was 100 percent throughout August and September 2014, but found that his impairment was 50 percent in November 2014 and 70 percent in January 2015.  *Id.* at 436, 450, 452, 454.  Dr. Cabatu also found that Ortiz's carpal tunnel syndrome was "moderately severe" and worse on the right, including at his last appointment in January 2015.  *Id.* at 438.  At the January 2015 consultation, Dr. Cabatu opined that Ortiz was unable to perform his work duties due to limited strength and pain in both hands, and that Ortiz had difficulty lifting, typing, and moving his wrists.  *Id.* at 436.  Dr. Cabatu also noted that Ortiz needed help with personal care and dressing.  *Id.* at 454.

---

[4] The June 3, 2014 surgery is also Ortiz's alleged disability onset date.  Pl. Mem. at 1.

### ii. Dr. Sayed Wahezi

Ortiz saw Dr. Sayed Wahezi, a doctor in the Rehabilitation Medicine

Department at Montefiore Medical Center, from August to September 2014.  *Id.* at

668, 678.[5]  Dr. Wahezi examined Ortiz for low back pain on August 7, 2014 and

opined that he likely had lumbar radiculopathy that was clinically suggestive of

radiculitis.  *Id.* at 671.  At this visit, Dr. Wahezi observed that Ortiz had restricted

forward bending motion, right foot pain, limited right lower extremity strength due

to pain, and reported that Ortiz could not walk more than one block and stand more

than 15 minutes without pain.  *Id.* at 668.  Dr. Wahezi ordered steroid injections for

Ortiz, which he administered on August 15, 2014.  *Id.* at 332.  Dr. Wahezi also

conducted an MRI of Ortiz on August 18, 2014, and found that Ortiz had: "L4/5 disc

space narrowing, bulging and posterior disc herniation in conjunction with mild to

moderate central stenosis, moderate bilateral foraminal stenosis, ligamentous

hypertrophy and retrolisthesis."  *Id.* at 676.

### iii. Dr. Elaina DellaCava

Ortiz received psychiatric treatment from Dr. Elaina DellaCava at

Montefiore Department of Psychiatry and Behavioral Science from March 2015 to at

least March 2017.  *Id.* at 393–434, 471–666.  Dr. DellaCava diagnosed Ortiz with

moderate major depressive disorder, generalized anxiety disorder, and post-

traumatic stress syndrome.  *See, e.g., id.* at 399, 402.  She also calculated that he

---

[5] Ortiz also received three epidural spinal injections from Dr. Wahezi prior to 2014 that resulted in two years of pain relief.  *Id.* at 668.  The AR does not contain medical records for these procedures.

had a Global Assessment of Functioning ("GAF") score of 58.  *Id.* at 397.[6]  Dr. DellaCava's detailed notes from their weekly therapy sessions explain that Ortiz often experienced an anxious mood, panic attacks, ruminations, worries about his children, intrusive thoughts about prior traumatic events, and impaired judgment. *See, e.g., id.* at 393, 397, 402, 425, 471, 490, 515, 525, 547, 554, 558, 569, 586, 594, 621, 648, 659.  Dr. DellaCava also commented that Ortiz had difficulty sleeping, increased appetite, diminished ability to concentrate, and felt depressed, overwhelmed, and worried.  *See, e.g., id.* at 430, 479, 510, 546, 574, 590, 608, 659. For a period from June to September 2016, Ortiz reported less or no depression or depressive symptoms and sought work.  *Id.* at 534, 539, 563, 568.  His depression worsened in October due to personal stressors and changes in medication.  *Id.* at 574.  Ortiz remained on medication for anxiety and depression throughout his treatment with Dr. DellaCava.  *See, e.g., id.* at 406, 420, 432, 473, 496, 509, 524, 545, 561, 581, 605, 620, 632, 645, 656, 665.  In January 2017, Dr. DellaCava diagnosed Ortiz with bipolar II disorder.  *Id.* at 617.

---

[6] "The GAF is 'a scale that indicates the clinician's overall opinion of an individual's psychological, social, and occupational functioning,' and runs from 0 to 100." *Maldonado v. Berryhill,* 16-CV-165 (JLC), 2017 WL 946329, at *8 n.21 (S.D.N.Y. Mar. 10, 2017) (quoting *Petrie v. Astrue,* 412 F. App'x 401, 406 (2d Cir. 2011)).  "A score of 41–50 indicates serious symptoms, a score of 51–60 indicates moderate symptoms and a score of 61–70 indicates some mild symptoms or some difficulty in social or occupational functioning. . . ." *Cabrera v. Berryhill,* 16-CV-4311 (AT) (JLC), 2017 WL 3172964, at *3 (S.D.N.Y. July 25, 2017), *adopted by,* 2017 WL 3686760 (S.D.N.Y. Aug. 25, 2017) (citing *Maldonado v. Colvin,* 15-CV-4016 (HBP), 2017 WL 775829, at *5 (S.D.N.Y. Feb. 28, 2017)).

### b. Consultative Physicians

### i. Dr. Marilee Mescon

Dr. Marilee Mescon examined Ortiz on March 16, 2015 as requested by the SSA. *Id.* at 386. Dr. Mescon opined that Ortiz had "no limitations in [his] ability to sit, stand, climb, push, pull, or carry heavy objects at this time." *Id.* at 389. She noted that Ortiz could "open and close buttons, zip zippers, tie a bow, write with a pen, and pick up a coin from a flat surface" and "needed no help changing for the exam or getting on and off the exam table." *Id.* at 386–87. Dr. Mescon diagnosed Ortiz with back pain, neck pain, bilateral carpal tunnel syndrome, and after an x-ray of the cervical spine, degenerative spondylosis and old compression fractures. *Id.* at 388–89. She opined that Ortiz's hand and finger dexterity was "intact," that Ortiz had no cervical pain or trigger points, and that Ortiz had full lumbar flexion and extension with no trigger points. *Id.* at 388.

### ii. Dr. Amory Carr

Dr. Amory Carr, a psychologist, conducted a mental examination of Ortiz on request by the SSA on March 16, 2015. *Id.* at 384. Dr. Carr diagnosed Ortiz with major depressive disorder, panic disorder, and possibly post-traumatic stress disorder. *Id.* She determined that he had impaired attention, concentration, and recent and remote memory skills. *Id.* at 383. She noted that Ortiz self-reported that he experienced depression and anxiety and could not do laundry, shop, or drive due to these symptoms. *Id.* at 383. She found that he had a moderate limitation in following and understanding simple directions, maintaining attention and concentration, learning new tasks, and making appropriate decisions, and he had

moderate to marked limitations performing simple tasks independently, maintaining a regular schedule, performing complex tasks independently, relating adequately to others, and appropriately dealing with stress. *Id.* at 383. She opined that these psychiatric problems may significantly interfere with Ortiz's ability to function on a daily basis. *Id.*

### c. Other Physicians

#### i. Dr. Alexandra Breuer

Ortiz was examined by Dr. Alexandra Breuer at Montefiore Hospital Internal Medicine Clinic on September 8, 2014 after complaints of chest pains. *Id.* at 337. She ordered an EKG to assess Ortiz's chest pain, which had normal results. *Id.* She diagnosed Ortiz with cervical radiculopathy on the left and herniated lumbar disk with radiculopathy. *Id.* at 340.

#### ii. Dr. Ronald Mann

Dr. Ronald Mann examined Ortiz in connection with his workers' compensation claim for the Department of Education. *Id.* at 362. In a November 11, 2014 examination, Dr. Mann diagnosed Ortiz with a mild partial orthopedic disability of 25 percent, but opined that his right carpal tunnel release was resolved and his left carpal tunnel release was resolving and that "there [was] no need for physical therapy." *Id.* at 366. Dr. Mann also mentioned that Ortiz could perform work, as long as he limited the use of the left hand and did not lift over 40 pounds. *Id.*

### iii. Dr. Jerry Kaplan

Dr. Jerry Kaplan performed an MRI of Ortiz's cervical spine on April 4, 2017. AR at 688, 695. Dr. Kaplan diagnosed Ortiz with carpal tunnel slowing, mild reversal of the cervical lordosis, mild to moderate discogenic disease of the mid to lower cervical spine, and a moderate sized central disc protrusion. *Id.* at 688, 694. He also observed radiculopathy and bilateral moderate median entrapment neuropathy in the wrist. *Id.* at 690. He opined that Ortiz's "vibration sense was noted to be mildly decreased at the tip of the left toe" as well as "the tips of the first three digits of both hands." *Id.* at 694. He noted that Ortiz was "able to heel, toe, and tandem walk" and had "normal bulk, tone, and strength throughout." *Id.*

### 3. ALJ Hearing

On March 2, 2017, Ortiz testified at a hearing before ALJ Lynn Neugebauer in the Bronx. *Id.* at 97. Ortiz, who was represented by counsel, was the only person to testify at the hearing. *Id.*

The ALJ questioned Ortiz about his alleged disability onset date, injuries, and ongoing symptoms. Ortiz testified that he had not worked full-time since he left the Department of Education in 2014 and that he worked part-time for four months in 2016 as a security guard, but he had to leave due to the stress, his panic attacks, and the physical requirements of job. *Id.* at 100–03. When asked if he could maintain a full-time job, Ortiz said he could "absolutely not" because sitting and standing were painful and his medication made him drowsy. *Id.* at 104. Ortiz testified that he could stand for 30 to 40 minutes before he needed to sit, and he could sit for 30 minutes before he needed to stand. *Id.* at 105–06. Ortiz reported

that he was "in pain all the time." *Id.* at 106. In reference to his carpal tunnel syndrome, Ortiz testified that he felt tingling and pressure in his hands and could not feel three of his fingers. *Id.* at 107–08. He also testified that he was on medication for his pain and received epidural injections, although "it [didn't] help too much." *Id.* at 105.

Ortiz also testified about his ability to perform activities in his daily routine. Ortiz mentioned that he did have a car and drove his children to counseling and to the grocery store, but he feared driving because his hands could not grip the steering wheel very well. *Id.* at 108. He stated that driving had "been a big problem" because "[he felt] afraid." *Id.* Ortiz also said he had to shop for groceries during non-peak hours because the line and the crowd gave him panic attacks. He testified that "[his] depression [was] something that [he had] been dealing with a lot. [He took] medication. [He didn't] like to be outside because [of his] panic attacks, too [many] people, too much noise[]. [He became] aggravated by peoples being in front of [him] and [he could not stand in] a line because it [bothered him]." *Id.* at 109. Ortiz reported that it was difficult to bend down to put on his shoes and tie laces. *Id.* at 110. He testified that he walked his children one block to their school every morning and picked them up in the afternoon. *Id.* at 110–11. Ortiz testified that he prepared dinner for his family but sometimes received assistance from his friends or his older child, especially with opening cans as his carpal tunnel precluded him from doing so. *Id.* at 108, 110. Ortiz stated that he did the laundry

and cleaned some of the house, but required assistance to move items, clean under the beds and mop. *Id.* at 112.

## II. DISCUSSION

### A. Standard of Review

#### 1. Judicial Review of Commissioner's Determination

An individual may obtain judicial review of a final decision of the Commissioner in the "district court of the United States for the judicial district in which the plaintiff resides." 42 U.S.C. § 405(g). The district court must determine whether the Commissioner's final decision applied the correct legal standards and whether it is supported by substantial evidence. *Butts v. Barnhart*, 388 F.3d 377, 384 (2d Cir. 2004). "Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)) (internal quotation marks and alterations omitted), s*ee also Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) ("under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains 'sufficien[t] evidence' to support the agency's factual determinations . . . whatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high").

The substantial evidence standard is a "very deferential standard of review." *Brault v. Soc. Sec. Admin.*, 683 F.3d 443, 448 (2d Cir. 2012). The Court "must be careful not to substitute its own judgment for that of the Commissioner, even if it might justifiably have reached a different result upon a de novo review." *DeJesus v.*

11

*Astrue*, 762 F. Supp. 2d 673, 683 (S.D.N.Y. 2011) (quoting *Jones v. Sullivan*, 949 F.2d 57, 59 (2d Cir. 1991)) (internal quotation marks and alterations omitted). "[O]nce an ALJ finds facts, [a court] can reject those facts 'only if a reasonable factfinder would have to conclude otherwise.' " *Brault,* 683 F.3d at 448 (quoting *Warren v. Shalala*, 29 F.3d 1287, 1290 (8th Cir. 1994)) (emphasis omitted).

In weighing whether substantial evidence exists to support the Commissioner's decision, "the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." *Selian*, 708 F.3d at 417 (quoting *Mongeur v. Heckler*, 722 F.2d 1033, 1038 (2d Cir. 1983)). On the basis of this review, the court may "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding . . . for a rehearing." 42 U.S.C. § 405(g).

In certain circumstances, the court may remand a case solely for the calculation of benefits, rather than for further administrative proceedings. "In . . . situations[ ] where this Court has had no apparent basis to conclude that a more complete record might support the Commissioner's decision, [the court has] opted simply to remand for a calculation of benefits." *Michaels v. Colvin,* 621 F. App'x 35, 38–39 (2d Cir. 2015) (quoting *Rosa v. Callahan,* 168 F.3d 72, 83 (2d Cir. 1999)) (internal quotation marks omitted). The court may remand solely for the calculation of benefits when "the records provide[ ] persuasive evidence of total disability that render[s] any further proceedings pointless." *Williams v. Apfel,* 204

F.3d 48, 50 (2d Cir. 1999).  However, "[w]hen there are gaps in the administrative record or the ALJ has applied an improper legal standard, [the court has], on numerous occasions, remanded to the [Commissioner] for further development of the evidence." *Pratts v. Chater,* 94 F.3d 34, 39 (2d Cir. 1996) (quoting *Parker v. Harris*, 626 F.2d 225, 235 (2d Cir. 1980)) (alteration in original).

## 2. Commissioner's Determination of Disability

Under the Social Security Act, "disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A); *accord* 42 U.S.C. § 1382c(a)(3)(A).  Physical or mental impairments must be "of such severity that [the claimant] is not only unable to do [his] previous work but cannot, considering [his] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

In assessing a claimant's impairments and determining whether they meet the statutory definition of disability, the Commissioner "must make a thorough inquiry into the claimant's condition and must be mindful that 'the Social Security Act is a remedial statute, to be broadly construed and liberally applied.' " *Mongeur*, 722 F.2d at 1037 (quoting *Gold v. Sec'y of H.E.W.*, 463 F.2d 38, 41 (2d Cir. 1972)).  Specifically, the Commissioner's decision must take into account factors such as: "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or

others; and (4) the claimant's educational background, age, and work experience."

*Id.* (citations omitted).

### a. Five Step Inquiry

The Commissioner's determination of disability follows a sequential, five-step inquiry. *Cichocki v. Astrue*, 729 F.3d 172, 173 n.1 (2d Cir. 2013); 20 C.F.R. § 404.1520.[7]  First, the Commissioner must establish whether the claimant is presently employed. 20 C.F.R. § 404.1520(a)(4)(i).  If the claimant is unemployed, at the second step the Commissioner determines whether the claimant has a "severe" impairment restricting her ability to work. 20 C.F.R. § 404.1520(a)(4)(ii).  If the claimant has such an impairment, the Commissioner moves to the third step and considers whether the medical severity of the impairment "meets or equals" a listing in Appendix One of Subpart P of the regulations. 20 C.F.R. § 404.1520(a)(4)(iii).  If so, the claimant is considered disabled.  *Id.*; 20 C.F.R. § 404.1520(d).  If not, the Commissioner continues to the fourth step and determines whether the claimant has the residual functional capacity ("RFC") to perform her past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv).  Finally, if the

---

[7]  In 2017, new SSA regulations came into effect.  These regulations apply only to claims filed with the SSA on or after March 27, 2017.  Accordingly, because Ortiz's claims were filed in 2015, the Court applies the regulations that were in effect when Ortiz's claims were filed.  *See, e.g.*, *Rousey v. Comm'r of Soc. Sec.*, 16-CV-9500 (HBP), 2018 WL 377364, at *8 n.8 & *12 n.10 (S.D.N.Y. Jan. 11, 2018) (noting 2017 amendments to regulations but reviewing ALJ's decision under prior versions); *O'Connor v. Berryhill*, 14-CV-1101 (AVC), 2017 WL 4387366, at *17 n.38 (D. Conn. Sept. 29, 2017) (same); *Luciano-Norman v. Comm'r of Soc. Sec.*, 16-CV-1455 (GTS) (WBC), 2017 WL 4861491, at *3 n.2 (N.D.N.Y. Sept. 11, 2017) (same), *adopted by*, 2017 WL 4857580 (N.D.N.Y. Oct. 25, 2017); *Barca v. Comm'r of Soc. Sec.*, 16-CV-187, 2017 WL 3396416, at *8 n.5 (D. Vt. Aug. 8, 2017) (same).

claimant does not have the RFC to perform past relevant work, the Commissioner completes the fifth step and ascertains whether the claimant possesses the ability to perform any other work. 20 C.F.R. § 404.1520(a)(4)(v).

The claimant has the burden at the first four steps. *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008). If the claimant is successful, the burden shifts to the Commissioner at the fifth and final step, where the Commissioner must establish that the claimant has the ability to perform some work in the national economy. *See Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009).

### b. Treating Physician Rule

"Regardless of its source, the ALJ must evaluate every medical opinion in determining whether a claimant is disabled under the [Social Security] Act." *Pena ex rel. E.R. v. Astrue*, 11-CV-1787 (KAM), 2013 WL 1210932, at *14 (E.D.N.Y. Mar. 25, 2013) (citing 20 C.F.R. §§ 404.1527(c), 416.927(d)) (internal quotation marks omitted). A treating physician's opinion is given controlling weight, provided the opinion as to the nature and severity of an impairment "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2). The regulations define a treating physician as the claimant's "own physician, psychologist, or other acceptable medical source who provides [the claimant] . . . with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with [the claimant]." 20 C.F.R. § 404.1502. Deference to such medical providers is appropriate because they "are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the]

medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical evidence alone or from reports of individual examinations." 20 C.F.R. § 404.1527(c)(2).

A treating physician's opinion is not always controlling. For example, a legal conclusion "that the claimant is 'disabled' or 'unable to work' is not controlling," because such opinions are reserved for the Commissioner. *Guzman v. Astrue*, 09-CV-3928 (PKC), 2011 WL 666194, at *10 (S.D.N.Y. Feb. 4, 2011) (citing 20 C.F.R. §§ 404.1527(e)(1), 416.927(e)(1)); *accord Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999) ("A treating physician's statement that the claimant is disabled cannot itself be determinative."). Additionally, where "the treating physician issued opinions that [were] not consistent with other substantial evidence in the record, such as the opinion of other medical experts, the treating physician's opinion is not afforded controlling weight." *Pena ex rel. E.R.*, 2013 WL 1210932, at *15 (quoting *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004)) (internal quotation marks omitted) (alteration in original); *see also Snell*, 177 F.3d at 133 ("[T]he less consistent [the treating physician's] opinion is with the record as a whole, the less weight it will be given.").

Importantly, however, "[t]o the extent that [the] record is unclear, the Commissioner has an affirmative duty to 'fill any clear gaps in the administrative record' before rejecting a treating physician's diagnosis." *Selian*, 708 F.3d at 420 (quoting *Burgess*, 537 F.3d at 129); *see Schaal v. Apfel*, 134 F.3d 496, 505 (2d Cir. 1998) (discussing ALJ's duty to seek additional information from treating physician

if clinical findings are inadequate).  As a result, "the 'treating physician rule' is inextricably linked to a broader duty to develop the record.  Proper application of the rule ensures that the claimant's record is comprehensive, including all relevant treating physician diagnoses and opinions, and requires the ALJ to explain clearly how these opinions relate to the final determination."  *Lacava v. Astrue*, 11-CV-7727 (WHP) (SN), 2012 WL 6621731, at *13 (S.D.N.Y. Nov. 27, 2012) ("In this Circuit, the [treating physician] rule is robust."), *adopted by*, 2012 WL 6621722 (S.D.N.Y. Dec. 19, 2012).

To determine how much weight a treating physician's opinion should carry, the ALJ must consider several factors outlined by the Second Circuit:

> (i) the frequency of examination and the length, nature and extent of the treatment relationship; (ii) the evidence in support of the treating physician's opinion; (iii) the consistency of the opinion with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other factors brought to the Social Security Administration's attention that tend to support or contradict the opinion.

*Halloran*, 362 F.3d at 32 (citation omitted); *see* 20 C.F.R. § 404.1527(c)(2).  "An ALJ's failure to 'explicitly' apply the *Burgess* factors when assigning weight at step two is a procedural error." *Estrella v. Berryhill*, 925 F.3d 90, 96 (2d Cir. 2019) (quoting *Selian*, 708 F.3d at 419–20). If, based on these considerations, the ALJ declines to give controlling weight to the treating physician's opinion, the ALJ must nonetheless "comprehensively set forth reasons for the weight" ultimately assigned to the treating source.  *Halloran*, 362 F.3d at 33; *accord Snell*, 177 F.3d at 133 (responsibility of determining weight to be afforded does not "exempt administrative

decisionmakers from their obligation . . . to explain why a treating physician's opinions are not being credited") (referring to *Schaal*, 134 F.3d at 505 and 20 C.F.R. § 404.1527(d)(2)). The regulations require that the SSA "always give good reasons in [its] notice of determination or decision for the weight" given to the treating physician. *Clark v. Comm'r of Soc. Sec.*, 143 F.3d 115, 118 (2d Cir. 1998) (alteration in original) (citations omitted). Indeed, "[c]ourts have not hesitate[d] to remand [cases] when the Commissioner has not provided good reasons." *Pena ex rel. E.R.*, 2013 WL 1210932, at \*15 (quoting *Halloran*, 362 F.3d at 33) (second and third alteration in original) (internal quotation marks omitted).

### c. Claimant's Credibility

An ALJ's credibility finding as to the claimant's disability is entitled to deference by a reviewing court. *Osorio v. Barnhart*, 04-CV-7515 (DLC), 2006 WL 1464193, at \*6 (S.D.N.Y. May 30, 2006). "[A]s with any finding of fact, '[i]f the Secretary's findings are supported by substantial evidence, the court must uphold the ALJ's decision to discount a claimant's subjective complaints.'" *Id.* (quoting *Aponte v. Sec'y of Health and Human Servs.*, 728 F.2d 588, 591 (2d Cir. 1984)). Still, an ALJ's finding of credibility "must . . . be set forth with sufficient specificity to permit intelligible plenary review of the record." *Pena*, 2008 WL 5111317, at \*10 (internal quotation marks omitted) (quoting *Williams v. Bowen*, 859 F.2d 255, 260–61 (2d Cir. 1988)). "The ALJ must make this [credibility] determination 'in light of the objective medical evidence and other evidence regarding the true extent of the alleged symptoms.'" *Id.* (quoting *Mimms v. Heckler*, 750 F.2d 180, 186 (2d Cir. 1984)).

SSA regulations provide that statements of subjective pain and other symptoms alone cannot establish a disability. *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (citing 20 C.F.R. § 404.1529(a)). Accordingly, the ALJ must follow a two-step framework for evaluating allegations of pain and other limitations. *Id.* First, the ALJ considers whether the claimant suffers from a "medically determinable impairment that could reasonably be expected to produce" the symptoms alleged. *Id.* (citing 20 C.F.R. § 404.1529(b)). "If the claimant does suffer from such an impairment, at the second step, the ALJ must consider 'the extent to which [the claimant's] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence' of record." *Id.* (citing 20 C.F.R. § 404.1529(a)). Among the kinds of evidence that the ALJ must consider (in addition to objective medical evidence) are: (1) a claimant's daily activities; (2) the location, duration, frequency, and intensity of the individual's pain or other symptoms; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; (6) any measures other than treatment the individual uses or has used to relieve pain or other symptoms (*e.g.*, lying flat on his back, standing for 15 to 20 minutes every hour, or sleeping on a board); and (7) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms. *Pena*, 2008 WL 5111317, at *11 (citing SSR 96-7p, 1996 WL 374186, at *3 (SSA July 2, 1996)).

**B. ALJ Decision**

The ALJ issued a decision on August 1, 2017 finding that Ortiz was not disabled for purposes of the Social Security Act. AR at 15.

### 1. Step One

At step one, the ALJ observed that Ortiz had not engaged in substantial gainful activity since June 3, 2014, the alleged onset date of his disability. The ALJ determined that although Ortiz had worked for a four-month period in 2016, this was an unsuccessful work attempt because he had to leave the position due to his physical and mental impairments. *Id.* at 17.

### 2. Step Two

At step two, the ALJ established that Ortiz's cervical and lumbar spine disorders, sleep disorders, and mood, anxiety, and posttraumatic stress disorders were severe impairments as they "significantly limit the ability to perform basic work." *Id.* at 18. She determined that Ortiz's bilateral carpal tunnel syndrome and bilateral wrist conditions were nonsevere as they did "not cause more than minimal limitation in [Ortiz's] ability to perform basic work activities." *Id.* She noted that Dr. Cabatu, Ortiz's treating physician, found "evidence of tenderness and decreased range of motion of the left wrist [and] bilateral hand numbness," but also reported that Ortiz had "muscle strength of -4 to +4/5 in the upper extremities, bilateral handgrip strength of 4/5, and intact reflexes in the upper extremities." *Id.* She also focused on Dr. Mann's conclusion that Ortiz's right carpal tunnel release had been resolved and his left carpal tunnel release was resolving and did not need further physical therapy treatment. *Id.*

At several points in her decision, the ALJ relied on the report from consultative examiner Dr. Mescon, who opined that Ortiz could perform tasks requiring fine hand movements without difficulty, and could "push, pull, lift, and carry heavy objects." *Id.* at 19. The ALJ gave little weight to the conclusion of Dr. Mann that Ortiz should not engage in work which required excessive use of the left hand or heavy lifting above 40 pounds because it was not in accord with Dr. Mescon's examination results that Ortiz could perform tasks with his hands and had normal strength and sensations in his upper extremities. *Id.* The ALJ also gave lesser weight to a January 2015 electrodiagnostic test by Dr. Breuer that diagnosed bilateral moderate median entrapment neuropathy in the wrists and to Ortiz's reports of hand pain and limited use because neither the test nor Ortiz's claims were consistent with Dr. Mescon's consultative findings. *Id.*

The ALJ also observed that Ortiz did not seek treatment for his upper extremity symptoms between March 2015 and March 2017. *Id.* at 20. She noted that Ortiz did see Dr. Kaplan after the March 2017 hearing and that Dr. Kaplan's tests "yielded evidence of significant focal slowing across the carpal tunnels." *Id.* However, she found that his examination "revealed no evidence of heat or swelling of the hands, wrists or elbows," and that Ortiz testified at the hearing that he could drive a car. *Id.*

### 3. Step Three

At step three, the ALJ determined that "[Ortiz] does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1." *Id.* at 21.

She reported that she had evaluated the impairments of the musculoskeletal system (section 1.00). Without further analysis, she concluded that Ortiz's physical impairments do not meet the severity of a listed impairment. *Id.*

The ALJ also assessed Ortiz's mental disorders (section 12.00) by determining if the paragraph B criteria were satisfied. *Id.*[8] The ALJ opined that Ortiz only had a moderate or mild limitation in his mental functioning, relying on notes from both his treating psychiatrist, Dr. DellaCava, and the consultative psychologist, Dr. Carr. *Id.* Because Ortiz had no extreme or marked limitations, the ALJ determined that he did not satisfy the "paragraph B" criteria. *Id.* The ALJ also considered "paragraph C" criteria, which require a finding of only marginal adjustment or "a minimum capacity to adapt to changes in the claimant environment or to demands that are not already part of the claimant's daily life." *Id.* at 22. The ALJ found that Ortiz did not satisfy the paragraph C criteria either. *Id.* She further noted that "no State Agency psychological consultant concluded that a mental listing is medically equaled." *Id.*

---

[8] Paragraph B provides guidance to determine if a listing is medically equaled. Paragraph B focuses on functional limitations. For mental impairments, Paragraph B requires a finding of "at least one extreme or two marked limitations in a broad area of functioning which are: understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; or adapting or managing themselves. A marked limitation means functioning in this area independently, appropriately, effectively and on a sustained basis is seriously limited. An extreme limitation is the inability to function independently, appropriately, or effectively, and on a sustained basis." AR at 21 (quoting 20 § C.F.R. 416.925(b)(2)(ii))

### 4. Step Four

#### a. Ortiz's Residual Functional Capacity

The ALJ then reviewed the record to determine Ortiz's RFC, and found that Ortiz had the "capacity to perform light work." *Id.* at 23.[9] The ALJ acknowledged Ortiz's complaints of neck, back, and leg pain and associated limitations with walking, standing, sitting, and carrying heavy objects, but concluded that there existed "no documentation in the record of an impairment or combination of impairments, which would preclude performance of light work." *Id.* The ALJ relied on the 2015 consultative exam with Dr. Mescon, which "yielded unremarkable results," and on Dr. Kaplan's 2017 MRI, which revealed "unremarkable results." *Id.* at 24.

Furthermore, the ALJ determined that no record of extensive treatment for spinal pain existed. *Id.* Because the ALJ found no evidence of "persisting debilitating spinal pain," she found that this impairment would not preclude Ortiz from performing light work. *Id.* She referred to Dr. Kaplan's findings that "revealed normal muscle strength and tone throughout, intact sensation except for mildly decreased vibration sensation at the tips of the first three digits of both hands and at the tip of the left toe, and an ability to heel/toe/tandem walk." *Id.* at 25. She noted that Dr. Mescon's report was consistent with these findings; the report established "no evidence of acute distress," and observed a full range of

---

[9] Light work is defined as consisting of simple, routine tasks performed in a low stress environment (defined as not having to work at an assembly line pace). AR at 23 (citing 20 C.F.R. §§ 404.1567(b) and 416.967(b)).

motion of the upper and lower extremities. *Id.*[10] The ALJ also evaluated evidence of Ortiz's sleep impairments and opined that the impairments would not impede the performance of light work. *Id.* at 26.[11]

The ALJ determined that Ortiz's mental impairments would not preclude Ortiz from the performance of light work because the record contained neither evidence of hospital treatment for these symptoms nor evidence of "persistent totally debilitating symptoms." *Id.* The ALJ accorded great weight to Dr. Carr's consultative psychological exam, which she found was consistent with the treatment records from Dr. DellaCava. *Id.* at 28. The ALJ did not give weight to Dr. Carr's determinations that were not in accord with the treatment records from Dr. DellaCava. *Id.* at 28–29.

The ALJ found further support for her determination that Ortiz could perform light work from statements made by Ortiz himself about his capacity to participate in activities of daily life. *Id.* at 29; *see also id.* at 108–10. While Ortiz informed Dr. Carr that he could not do laundry or shop due to his mental impairments, he told Dr. Mescon, the consultative orthopedic examiner, that he did do these activities and also testified that he did these activities in his ALJ hearing.

---

[10] The ALJ gave little weight to Dr. Mescon's opinion that Ortiz had an unlimited ability to push, pull, or carry heavy objects as this statement contradicted other findings she had made, as well as X-ray examinations and the record as a whole. *Id.* at 25.

[11] Ortiz had been advised to attend a sleep clinic after difficulty using a CPAP machine, but he did not follow up. *Id.* at 26. The ALJ also observed that there was no evidence of excessive daytime sleepiness. *Id.*

*Id.* at 30.  Therefore, the ALJ determined that Ortiz's impairments did not preclude him from performing daily routines.  Ortiz also informed Dr. Carr that he did not drive, yet the ALJ found no evidence of impairment that precluded him from driving and pointed out that he testified that he drove at the ALJ hearing.  *Id.*  The ALJ concluded that Ortiz's alleged symptoms and impairments did not match the medical evidence in terms of the "intensity, persistent, and limiting effects of the symptoms," and therefore Ortiz retained some residual functional capacity to perform light work.  *Id.* at 31.

### b. Ortiz's Capacity to Perform Past Work

The ALJ determined that Ortiz no longer had the capacity to perform his past relevant work as a paraprofessional and a security worker.  *Id.*

### 5. Step Five

At step five, the ALJ considered whether Ortiz could perform other work that existed in sufficient quantity in the national economy given his RFC, age, and work experience.  *Id.*  The ALJ focused on the evidence that Ortiz was 43 years old at the alleged disability onset date, had at least a high school education, and could communicate in English.  *Id.*  The ALJ consulted a vocational expert after the hearing to determine if "jobs exist[ed] in the national economy for an individual" with Ortiz's age, education, work experience, and RFC.  *Id.* at 32.  In May 2017, the vocational expert opined that Ortiz could perform work such as cleaner-housekeeper, photocopy machine operator, and table attendant, of which 154,000 jobs existed in the national economy in total.  *Id.*  Because the vocational expert determined that "[Ortiz] is capable of making a successful adjustment to other work

that exists in significant numbers in the national economy," the ALJ concluded that Ortiz was "not disabled." *Id.*

### 6. ALJ's Determination and Appeal

On August 1, 2017, the ALJ determined that Ortiz had "not been under a disability, as defined by the Social Security Act, from June 3, 2014 through the date of this decision." *Id.* Ortiz appealed the ALJ's decision on October 2, 2017 to the SSA's Appeals Council. *Id.* at 4. The SSA denied his appeal on November 15, 2017.

### C. Analysis

Ortiz argues that the ALJ erred in four ways: (1) she incorrectly assessed the severity of Mr. Ortiz's carpal tunnel syndrome at step two; (2) she failed to include any manipulative limitations of the hands or fingers which resulted in a flawed RFC analysis; (3) she did not give controlling weight to Ortiz's treating physicians; and (4) her RFC determination was not supported by substantial evidence. Pl. Mem. at 1.

The Commissioner responds that: (1) the ALJ correctly determined that Ortiz did not have severe carpal tunnel syndrome; (2) the ALJ accurately found that Ortiz could perform a wide range of light work; (3) the ALJ properly rejected Ortiz's allegations of disabling pain and limitation; and (4) substantial evidence supports the ALJ's determination at step five. Def. Mem. at 16, 19, 22, 24.

For the reasons discussed below, the Court concludes that the ALJ erred by failing: (1) to adequately consider the severity of Ortiz's carpal tunnel syndrome; (2) to consider additional evidence in her RFC analysis; and (3) to comply with the treating physician rule.

**1. The ALJ Erred at Step Two in Finding that Ortiz's Carpal Tunnel Was Nonsevere**

Ortiz argues that the ALJ erred by not finding Ortiz's carpal tunnel syndrome to be a severe impairment. He disagrees with the ALJ's finding that "Ortiz's carpal tunnel does not result in more than minimal limitation and is not severe" and argues that "the ALJ's finding is based on an incorrect application of the law and is not supported by substantial evidence." Pl. Mem. at 9. In opposition, the Commissioner contends that sufficient evidence in the record supports a non-severe finding. Def. Mem. at 18. The Court concludes that the ALJ erred because she ignored the evidence establishing that Ortiz's carpal tunnel syndrome surpassed the *de minimis* standard.

First, Dr. Cabatu, Ortiz's treating physician, found that Ortiz had "moderately severe" bilateral carpal tunnel syndrome on each of his visits, including at Ortiz's last appointment in January 2015. AR at 438. The ALJ does not mention this medical finding in her decision. This diagnosis is indicative of Ortiz's carpal tunnel condition and should have been considered by the ALJ.[12]

Second, the ALJ determined that Ortiz's bilateral carpal tunnel syndrome and bilateral wrist conditions were nonsevere because they did "not cause more than minimal limitation in [Ortiz's] ability to perform basic work activities." *Id.* at

---

[12] Similarly, in *Rivera v. Comm'r of Soc. Sec.*, the claimant's diagnostic testing revealed that she had "mild left carpal tunnel syndrome" 368 F. Supp. 3d 635, 635 (S.D.N.Y. 2019). The ALJ in that case found that the claimant's carpal tunnel syndrome was a severe impairment and considered her hand limitations in the RFC analysis. *Id.* at 640–41. On appeal, the district court upheld the ALJ's findings. *Id.* at 651.

18. The ALJ can justify a "finding of 'not severe'. . . if the medical evidence establishes only a 'slight abnormality' which would have 'no more than a minimal effect on an individual's ability to work.'" *Acosta v. Barnhart*, 99-CV-1355 (LAP) (AJP), 2003 WL 1877228, at *12 (S.D.N.Y. Apr. 10, 2003) (citing *Rosario v. Apfel,* 97-CV-5759, 1999 WL 294727 at *5 (E.D.N.Y. Mar. 13, 1999), *adopted by,* Order, Dkt. No. 25 (June 12, 2003). The determination of whether a condition is severe requires application of a "*de minimis*" standard. *Kessler v. Colvin*, 48 F. Supp. 3d 578, 593 (S.D.N.Y. 2014) ("Because Step Two merely serves as a filter to screen out *de minimis* disability claims, a finding of any severe impairment, whether attributable to a single condition or a combination of conditions, is enough to satisfy its requirements.").

In this case, as noted, Dr. Cabatu classified Ortiz's carpal tunnel syndrome as "moderately severe." AR at 438. An examination by Dr. Kaplan in 2017 revealed that Ortiz had "mildly decreased vibration sense" in "the tips of the first three digits of both hands," as well as "significant focal slowing across the carpal tunnels." *Id.* at 694. Ortiz himself also testified that he had difficulty using his hands. *Id.* at 103. The reports from his physicians combined with his own testimony raise Ortiz's carpal tunnel syndrome above the *de minimis* level.[13] On remand, the ALJ should

---

[13] The Commissioner argues that the ALJ correctly determined that Ortiz's carpal tunnel was nonsevere because Ortiz had carpal tunnel release surgery in 2014 and his failure to seek continued treatment after the surgery supports a nonsevere finding. Def. Mem. at 16 (citing *Bennett v. Astrue*, 06-CV-0649, 2009 WL 1035106, at *8 (N.D.N.Y. Apr. 17, 2009). However, "just because plaintiff's disability went untreated does not mean he was not disabled." *Gallishaw v. Comm'r of Soc. Sec.*, 296 F. Supp. 3d 484, 500 (E.D.N.Y. 2017) (citing *Shaw v. Chater*, 221 F.3d 126, 133

reconsider whether Ortiz's carpal tunnel syndrome is a severe impairment, specifically accounting for Dr. Cabatu's findings.

### 2. The ALJ Erred by Not Considering Evidence in Her RFC Determination

Ortiz also contends that: 1) the ALJ's RFC analysis is flawed because she failed to consider Ortiz's carpal tunnel syndrome, and 2) the RFC analysis is not supported by substantial evidence. Pl. Mem. at 12, 15. The Court concludes that the ALJ's RFC analysis is incomplete because she did not consider Ortiz's carpal tunnel syndrome or adequately consider his spinal limitations.

### a. Carpal Tunnel Syndrome

In assessing Ortiz's RFC, the only physical impairments the ALJ considered were spinal pain and sleep disorder. AR at 23–26. As discussed, the ALJ should have considered whether Ortiz's carpal tunnel syndrome was a severe impairment, and thus her RFC analysis was incomplete. Pl. Mem. at 8. "[W]here the ALJ's step-two error prejudiced the claimant at later steps in the sequential evaluation process, remand is required." *Davila v. Commissioner*, 16-CV-4774 (KAM), 2018 WL 5017748, at *11 (E.D.N.Y. Oct. 16, 2018) (citing *Southgate v. Colvin*, 14-CV-166, 2015 WL 6510412 (D. Vt. Oct. 28, 2015)).[14]

---

(2d Cir. 2000)). Furthermore, Ortiz did seek multiple months of treatment after his surgery and testified that he continued to experience difficulties even after his treatment ended. AR at 107.

[14] The ALJ found discrepancies between statements made by Ortiz to consultative examiners and what Ortiz testified to at the hearing. AR at 29–31 (Ortiz told the ALJ that he had difficulty tying his shoes but Dr. Mescon, the consultative orthopedic examiner, noted that Ortiz could dress himself; Ortiz told Dr. Mescon that he could not drive, but told the ALJ he did; Ortiz told Dr. Carr, the consultative

Furthermore, even if the ALJ reasonably found Ortiz's carpal tunnel syndrome to be nonsevere, she still needed to consider his manipulative limitations, as reported by several medical professionals. *See, e.g., Davila*, 2018 WL 5017748 at *19 ("even if on remand the ALJ concludes that plaintiff's carpal tunnel syndrome is not severe, this conclusion will not excuse a failure to address the impact of any limitations as part of the RFC determination"). As Ortiz contends, while "the ALJ found that [] Ortiz could perform light work with exceptions, ***none*** of the exceptions related to manipulative limitations of the hands or fingers." Pl. Mem. at 12 (emphasis in original). On remand, the ALJ should consider Ortiz's manipulative limitations in her RFC analysis.

### b. Other Impairments

Ortiz further contends that substantial evidence does not support the ALJ's RFC determination because she failed to consider: "(1) the limiting effects of Mr. Ortiz's degenerative disc disease of the cervical and lumbar spine; (2) the side effects of Mr. Ortiz's medications, and (3) Mr. Ortiz's obesity." Pl. Mem. at 16. The Court concludes that the ALJ considered the second and third claims, and properly

---

psychiatric examiner, that he could not shop but told Dr. Mescon he could; Ortiz told Dr. Carr he could not do laundry but told Dr. Mescon and the ALJ that he could). Because of these findings, the ALJ discounted Ortiz's credibility. *Id.* at 31 ("The overall record does not support the severity of [Ortiz's] allegations"). However, Dr. Cabatu's medical records establish evidence of impairments that match Ortiz's subjective complaints. *See, e.g., id.* at 438, 444, 452. Because the ALJ erred at step two, the Court will not address the issue of Ortiz's credibility, but instructs the ALJ to consider the entire record and reassess Ortiz's credibility upon remand. *Soc. Sec. Ruling 16-3p Titles II & XVI: Evaluation of Symptoms in Disability Claims*, SSR 16-3P, 2017 WL 5180304, at *2 (S.S.A. Oct. 25, 2017) ("We instruct our adjudicators to consider all of the evidence in an individual's record").

denied them because the record lacks medically determinable evidence to support their being considered impairments. AR at 29. However, the ALJ failed to consider the limiting effects of Ortiz's spinal impairments.

### i. Spinal Limitations

The ALJ erred in determining that Ortiz's spinal limitations would not impede his ability to do light work. Ortiz testified that he could only sit and stand for 30 to 40 minutes at a time before he experienced pain. AR at 105–06. Furthermore, Dr. Wahezi found that Ortiz had restricted forward-bending motion, right foot pain, right lower extremity strength limited due to pain, and reported that Ortiz could not walk more than one block and stand more than 15 minutes before pain. *Id.* at 668.

The ALJ's decision that Ortiz can perform light work lacks support in the record because Ortiz's limitations preclude him from much (if not all) of the functions required for these forms of work. For light work, "most light jobs—particularly those at the unskilled level of complexity—require a person to be standing or walking most of the workday." *Titles II & XVI: Capability to Do Other Work—The Medical-Vocational Rules as a Framework for Evaluating a Combination of Exertional and Nonexertional Impairments,* SSR 83-14, 1983 WL 31254, at *4 (S.S.A. 1983). Dr. Wahezi observed and Ortiz testified that he could walk and stand for only 15 to 30 minutes at a time, likely indicating that Ortiz would be unable to fulfill the requirement of light work. AR at 105–06, 668. Even assuming this impairment did not totally erode Ortiz's capacity to perform light

work, "any limitation on these functional abilities must be considered very carefully to determine its impact on the size of the remaining occupational base of a person who is otherwise found functionally capable of light work." SSR 83-14, 1983 WL 31254, at *4. The ALJ did not conduct a detailed analysis of how Ortiz's lower back and spinal injuries would affect his ability to perform light work or consider any impediments such pain and restrictions may cause. Ortiz's RFC must be reevaluated upon remand with his spinal limitations taken into account.

### ii. Side Effects from Medication

The ALJ correctly determined that Ortiz's side effects from his medication were not supported by substantial evidence. There were no reports from any of Ortiz's doctors about any persistent side effects from his medications.[15] The ALJ found that "[Ortiz] alleges that his medications make him drowsy. However, there is no evidence of persistent side effects, which would preclude performance of light work consisting of simple, routine tasks." AR at 29. Because the record does not include either medical evidence or testimony by Ortiz that support the argument that Ortiz's medications cause side effects constituting a limitation, the ALJ correctly denied this claim.

### iii. Obesity

The ALJ also properly rejected Ortiz's argument that his obesity creates a limitation. Social Security guidelines articulate that "an ALJ should consider

---

[15] In fact, Dr. DellaCava noted that side effects from certain medication subsided after switching to a different type. AR at 525.

whether obesity, in combination with other impairments, prevents a claimant from working." *Guadalupe v. Barnhart*, 04-CV-7644 (HB), 2005 WL 2033380, at *6 (S.D.N.Y. Aug. 24, 2005) (citing *Titles II and XVI: Evaluation of Obesity*, SSR 02-1p, 2000 WL 33952015 (S.S.A 2000); 20 C.F.R. 404, Subpt. P, App. 1, Part A § 1.00B(2)(d)). Yet "obesity is not in and of itself a disability." *Cruz v. Barnhart*, 04-CV-9011 (GWG), 2006 WL 1228581, at *9 (S.D.N.Y. May 8, 2006).

Nowhere in the medical record did any treating doctor mention severe medical issues related to his obesity. Ortiz did not testify to any medical issues related to his obesity, nor that his obesity worsened any symptoms that he experienced. Therefore, no evidence in the record supports a finding of any limitations imposed by Ortiz's obesity.

### 3. The ALJ Erred by Failing to Give Controlling Weight to Ortiz's Treating Physicians

Ortiz contends that the ALJ erred in not assigning controlling weight to his treating physicians. Pl. Mem. at 14. "The opinion of a treating physician is given controlling weight if it is well supported by medical findings and not inconsistent with other substantial evidence." *Rosa*, 168 F.3d at 78–79. The Court concludes that the ALJ erred by not giving controlling weight to Ortiz's treating physicians.[16]

---

[16] Ortiz disagrees with the ALJ's application of the treating physician rule for determining the impact of his physical impairments on his disability claim, specifically because the ALJ gave greater weight to the opinion of Dr. Mescon than to that of Dr. Cabatu. Ortiz does not allege any treating physician error in regards to his mental impairments, and the Court does not consider the application of the treating physician rule for the mental health professionals who treated Ortiz because the ALJ correctly gave greater weight to the opinion of Dr. DellaCava than to that of Dr. Carr. Pl. Mem. at 14–15, AR at 24–29.

The ALJ assigned "good" weight to the opinion of Dr. Mescon, a consultative examiner who saw Ortiz on only one occasion, but did not assign any weight to the opinions of Dr. Cabatu or Dr. Wahezi, Ortiz's treating physicians.  AR at 19, 24–25.[17]  "[T]he opinion of a consulting physician who examined the claimant once generally does not constitute substantial evidence on the record as a whole, particularly when contradicted by other evidence."  *Thompson v. Sullivan*, 957 F.2d 611, 614 (8th Cir. 1992).  Furthermore, not assigning clear weight to the different physicians is grounds for remand.  *See, e.g., Urena v. Berryhill,* No. 18-CV-3645 (JLC), 2019 WL 1748131, at *14 (S.D.N.Y. Apr. 19, 2019) (remanding to "specifically assign" weight); *Rivera v. Berryhill*, No. 17-CV-991 (JLC), 2018 WL 4328203, at *14 (S.D.N.Y. Sept. 11, 2018) (remanding because ALJ "failed to give good reasons for declining to give [the treating physician's] opinion controlling weight"). Accordingly, the Court directs the ALJ on remand to assign specific weight to each of the opinions of Ortiz's treating physicians and provide "good reasons" for the weight accorded to each opinion if it is assigned less than controlling weight.  *Ben v. Berryhill,* 17-CV-08345 (DCF), 2019 WL 1447892, at *7 (S.D.N.Y. Mar. 19, 2019) (citing 20 C.F.R. § 416.927).

### III. CONCLUSION

For the foregoing reasons, Ortiz's motion is granted, the Commissioner's cross-motion is denied, and the case is remanded pursuant to sentence four of 42

---

[17] Indeed, the ALJ cited to Dr. Mescon's exam multiple times (by Ortiz's count 11 times, *see* Pl. Mem. at 14), which is indicative of her overreliance on a consultative examination.

U.S.C. § 405(g).  On remand, the ALJ is instructed to: 1) reconsider whether Ortiz's carpal tunnel syndrome is a severe impairment; 2) reassess Ortiz's RFC; 3) review Ortiz's credibility; and 4) assign specific weight to each of the opinions of Ortiz's treating physicians and provide good reasons if the opinions are not found to be controlling.

**SO ORDERED.**

Dated: August 2, 2019
      New York, New York

_____
JAMES L. COTT
United States Magistrate Judge